**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Cause No. 2:04-CR-62 PS |
| | ) | |
| | ) | |
| JOSEPH A. TRZECIAK | ) | |

**<u>OPINION AND ORDER</u>**

Acting on both an arrest warrant and a state search warrant, the Hammond Police Department SWAT team entered the residence of Joseph Trzeciak, who greeted the officers by pointing a gun at them. Trzeciak eventually dropped the gun and was arrested. In the process of arresting him, members of the SWAT team observed the handgun on the floor of the residence. Trzeciak is charged with felon in possession of a firearm and the subsequent retrieval of that handgun forms the basis for the motion to suppress presently before the Court [Doc. 34].

The Court held a suppression hearing on April 20, 2005. At the end of the hearing, Trzeciak argued (1) that the Hammond Police did have a reason to believe that Trzeciak was in the house when they entered to execute the felony arrest warrant; and (2) because the government admitted that the state search warrant was invalid, the police had no legal right to remove the gun from the house.[1] The Court allowed the parties to submit any supplemental briefing as a result of what took place during the hearing. The defendant filed a supplemental brief; the government did not. Because the police acted in good faith when they relied on a

---

[1] Trzeciak also argued that the police did not have the right to initially stop the van in his driveway. (Trzeciak ran from the van into the house). Trzeciak has since conceded this argument, admitting that the police officer had reasonable suspicion to stop the van, and therefore it will not be addressed further. (*See* [Doc. 42].)

facially valid warrant, and because the gun would have inevitably been discovered anyway, the motion to suppress is denied.

## FACTUAL BACKGROUND

At the time of Trzeciak's arrest on July 26, 2004, he was well known to the Hammond Police Department.  Throughout the weeks leading up to that time there were numerous run-ins with police.  First, on June 25, 2004, Hammond Police were dispatched to a domestic dispute at 4436 Hohman, Hammond, Indiana, the scene of Trzeciak's subsequent arrest.  Trzeciak's wife, Laura Lynn Trzeciak, told the police that Trzeciak hit her repeatedly with a closed fist and kicked her in the head.  The police officers observed that her face was swollen and red and that her neck was scratched and red.  As a result, an arrest warrant was issued for domestic battery, a Class A Misdemeanor.  (*See* Gov't Ex. 15.)

On July 14, 2004, Officer Matthew Porter of the Hammond Police Department was on patrol and witnessed two subjects arguing in the street.  As he approached the area, one of the two subjects fled.  The person who did not flee told Officer Porter that the person who ran was Joseph Trzeciak.  Officer Porter stayed with the other individual who also indicated that Trzeciak had pulled a gun on him.  It was only later that Officer Porter became aware that Trzeciak had an outstanding warrant for domestic violence.  In addition, a day or two later Officer Porter saw a memo from the Chicago Police Department which indicated that Trzeciak was wanted for questioning regarding his possible involvement in a homicide that occurred in Chicago.

On July 22, 2004, Officer Porter came into contact with Trzeciak again, this time when he was actively looking for him to execute the domestic battery arrest warrant.  Officer Porter

2

observed a blue Ford Bronco pull out of Trzeciak's driveway at 4436 Hohman and pull into a gas station. Officer Porter pulled behind the Bronco and observed Trzeciak standing at a gas pump. Likely upon noticing Officer Porter, Trzeciak jumped back into the Bronco and took off. Officer Porter activated his lights and siren and pursued the vehicle through several streets and alleys of Hammond. While fleeing, Trzeciak drove between baseball fields and crashed through a fence before losing Officer Porter in Chicago. Based on this episode, on July 23, 2004, an arrest warrant was issued for Trzeciak for Resisting Law Enforcement, a Class D Felony. (*See* Gov't Ex. 16.)

Separately, on July 23, 2004, Hammond City Judge Jeffrey A. Harkin signed a search warrant for 4436 Hohman Avenue that was presented to him by Hammond Police Detective Anthony Mosier. (*See* Defendant's Ex. A.) The evidence supporting the search warrant was developed by use of an anonymous informant and accompanying police work which corroborated some of the things the informant had said. Among other items listed to be searched for in the home were firearms. (*Id.*)

On July 26, 2004, Officer Porter was working the midnight shift and was driving in the area of 4436 Hohman. He saw a dark van pulling out of the driveway. There were two people in the van – a female driver and a male passenger. Officer Porter believed the male passenger to be Trzeciak. When he spotted the van, Officer Porter activated his lights and turned in behind the van to block it in the driveway. Officer Porter exited his vehicle and called for additional units. The driver of the van opened the driver-side door. Officer Porter ordered the occupants to keep the doors closed and stay inside the vehicle. Officer Porter observed the passenger engaging in a lot of movement down on the floorboard and talking erratically to the driver.

Within seconds, the passenger of the van opened up the passenger-side door and yelled to Officer Porter "what's the problem?"  Officer Porter ordered him to stay in the van.  The passenger ignored Porter's commands and got out of the van.  Officer Porter ordered him to get down on the ground, but this command was also ignored.  The passenger started to move, but stopped at the front left side of the van and took a firing position over the front of the van and pointed a gun at Officer Porter.  As he was leaning over the van pointing the weapon, the passenger said, "What's up?"  Officer Porter at this time positively identified the passenger as defendant Trzeciak.  For his own safety, Officer Porter jumped back towards his squad car for cover and Trzeciak took off running.

Officer Miller arrived on the scene and took the driver out of the van.  The driver of the van indicated that Trzeciak ran back along the side of the garage toward the back of the house.  Officer Porter quickly went to look into the backyard to see if Trzeciak was there, but decided to wait until several officers arrived on the scene out of concern for officer safety given the fact that Trzeciak was armed and willing to at least point the weapon at officers.  After checking the basement of a neighboring house whose door was open and after checking another basement, Officer Porter went back into the backyard of 4436 Hohman and set up position.

While he was in the backyard Officer Porter saw movement in the blinds in the west window of the house.  Officer Porter testified that the movement was smooth – almost like a shadow moving on the inside of the home.  Officer Porter believed it to be a human being, even though he had observed a dog at the location once before.  Thus, Officer Porter believed that Trzeciak was inside his home.

After seeing the shadowy movement inside the house, Officer Porter spoke to the driver of the van and she told him that she did not think that anybody else was inside the house because no one else was home when she and Trzeciak left the residence a few minutes earlier.[2]  The Hammond SWAT team was called and a crisis negotiation team was also called in.  According to Lt. Ralph Bogie of the SWAT team, numerous efforts were made by the negotiation team before the SWAT team was used.  For example, the negotiation team attempted to call the house and a cell phone number repeatedly.  After that did not work, the negotiation team attempted to talk to Trzeciak over a bull horn.  This went on for about an hour.  After these tactics failed, the decision was made that it was unlikely that Trzeciak was going to come out on his own, so the SWAT team was going to have to go in and get him.

The SWAT team knew that Trzeciak had led one officer on a high speed chase a few days earlier, had pointed a gun at an officer earlier that night, that he was wanted for questioning in Chicago in connection with a murder, and that he had outstanding warrants for his arrest and that there was a search warrant for the residence.  The SWAT team was therefore operating under the impression that Trzeciak was armed and dangerous.  As a result, Lt. Bogie testified that a large amount of tear gas was introduced into the house through numerous windows.  They waited approximately 15-20 minutes after the tear gas was deployed before entering the home so that it would have time to take effect.

Wearing gas masks and protective body covering, the SWAT team entered the rear of the house.  They had to pop open the rear door of the back porch with a crow bar and force the inner

---

[2] For the record, the Court found Officer Porter to be very credible.

5

door open with a ram.  The SWAT team of seven officers went in with shields yelling "Police! Search Warrant!"

Lt. Bogie testified that almost immediately upon entry into the house he encountered Trzeciak pointing a handgun at him.  Trzeciak was at the bottom of the stairs in the basement and Lt. Bogie was in the doorway at the top of the stairs.  Lt. Bogie yelled "Gun!" and moved away from the doorway and out of the line of fire.  Trzeciak was ordered to drop the gun multiple times.  Lt. Bogie heard an object fall and assumed it was the gun.

At that point, Lt. Bogie told one of the other tactical team members to throw a diversionary device down the stairway.  The diversionary device is a very loud noise and a flash of light designed to distract a suspect so that police can have enough time to safely arrest a subject.  The diversionary device worked, and the SWAT team was able to subdue Trzeciak. They handcuffed him on the floor of the basement, searched his body, and removed him from the residence.  A protective sweep of the rest of the residence immediately was undertaken to determine whether there were any additional occupants in the house.  After opening up the locked kitchen door, two pit bull dogs came running at the SWAT team.  The first pit bull was shot and killed by several team members and the other was later secured.  (*See* Defendant's Ex. B.)  No other people were found in the house.

The SWAT team left the silver handgun on the floor of the basement at the bottom of the stairs where Trzeciak dropped it because it is the SWAT team's job to safely arrest people in the home, but not to process the scene which is left to the evidence technicians and detectives.  (*See* Gov't Ex. 7; Defendant's Ex. B.)

At approximately 5:30 a.m., Special Agent Daniel Mitten with the Bureau of Alcohol, Tobacco and Firearms ("ATF") was notified that Trzeciak had been arrested at his residence after the Hammond Police Department had been called out to his home.[3]  Agent Mitten was informed that Trzeciak had pointed a gun at a patrolman and at members of the SWAT team in the house.  After arriving at the scene, Agent Mitten was briefed as to what had happened and told that the weapon was still in the house.  Det. Mosier informed Agent Mitten that he had applied for and obtained a search warrant a few days earlier for Trzeciak's residence from a Hammond City Judge.

Agent Mitten contacted the Assistant United States Attorney ("AUSA") on duty via telephone regarding whether to obtain a federal search warrant for the house.  Agent Mitten informed the AUSA on duty about what had happened at the scene that night and let him know that a state search warrant had already been obtained by Hammond Police.  Det. Mosier then spoke directly to the AUSA, advising him of the events that had taken place leading up to Trzeciak's arrest.  A copy of the state search warrant however was not provided to the AUSA. After the AUSA was done speaking with Det. Mosier, Agent Mitten again spoke with the AUSA.  The AUSA indicated to Agent Mitten that the probable cause in the state warrant seemed to be fine and that it was not necessary to obtain a federal search warrant at that time and that he could go forward with his full search of the house with the state search warrant.

---

[3] A few days earlier, Agent Mitten was asked by federal marshals if he was interested in assisting them with Trzeciak's case.  On July 23, 2004, Agent Mitten did a background check of Trzeciak's criminal history and discovered that he had at least one and possibly three prior felony convictions and twenty-three adult arrests which prompted ATF to get involved.

After speaking with the AUSA, Agent Mitten did not immediately search the house. Instead, it was necessary for him to wait to enter the home, after the tear gas fumes had subsided. In the meantime, the Hammond Police Department had established a perimeter around the house to secure it.

Several officers assisted Agent Mitten in the execution of the search warrant. The search took about three hours to complete, and was very difficult because of the lingering tear gas. During the search, the ATF recovered a Smith & Wesson, stainless steel handgun in the basement, near the steps where Trzeciak was arrested. A second ammunition magazine related to the firearm was also recovered, as well as three separate controlled substances from the defendant's refrigerator.[4]

## DISCUSSION

The defendant contends that the gun and ammunition recovered from his home should be suppressed for two reasons: (1) because the government did not meet its burden of proof to enter Trzeciak's home with a felony arrest warrant and arrest him, and (2) because the ATF had no legal right to remove the gun from the house hours after Trezciak was arrested when the government did not have a valid search warrant.

### A.    Entering Trzeciak's Home to Arrest Him

In *Payton v. New York*, 445 U.S. 573 (1980), the Supreme Court held that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id.* at

---

[4] The government has voluntarily dismissed the counts in the indictment relating to the controlled substances recovered from the defendant's house. The suppression of those items is therefore not before the Court.

8

603.  All that is needed, beyond the arrest warrant, is "reason to believe" (1) the suspect named

in the arrest warrant lives at the dwelling; and (2) the suspect is currently in the dwelling at the

time of the execution of the arrest warrant.  *Id.*; *see e.g.*, *United States v. Pallais*, 921 F.2d 684,

691 (7th Cir. 1990).

Here, it is undisputed that Trzeciak had outstanding arrest warrants for domestic battery

(a misdemeanor) and resisting law enforcement (a felony) on July 26, 2004.   It is also

undisputed that Trzeciak resided at the address in question and the government readily

established that the police believed this to be so.  First, the arrest warrants listed Trzeciak's

residence as 4436 Hohman and on July 22, 2004, Officer Porter observed Trzeciak leaving that

address in a blue Bronco.  Four days later, on July 26, 2004, Officer Porter stopped a van

backing out of the driveway at 4436 Hohman, and Trzeciak exited the van.  Finally, Detective

Mosier, in preparation for obtaining the search warrant, confirmed with the Lake County

Recorder's Office that Trzeciak was the owner of the property located at 4436 Hohman.

The defendant, however, contends that the government failed to meet its burden on the

second prong: that the officers had reason to believe that Trzeciak was inside the residence at the

time of the execution of the arrest warrant.  The Court respectfully disagrees.  The evidence is

uncontested that Officer Porter stopped the van in the driveway of 4436 Hohman Avenue and

ordered Trzeciak out of the car and onto the ground.  He failed to comply; he got out and pointed

a gun at Officer Porter and then fled on foot.

The officer had every reason to believe that Trzeciak took refuge back in his home.  First,

the driver of the van indicated that Trzeciak went back along the south side of the garage toward

the back of the house.  A few minutes later, Officer Porter set up position behind the house at

9

4436 Hohman.  While he was in the backyard Officer Porter saw movement in the blinds in the west window of the house.  Officer Porter testified that the movement was smooth – almost like a shadow moving on the inside of the home.  Officer Porter believed it to be a human being. Finally, the driver of the van informed Officer Porter that no one else was in the house when she and Trzeciak left the residence a few minutes earlier.  Clearly, when taken in combination, all of these facts gave the police reason to believe that Trzeciak was inside his home at 4436 Hohman Avenue.  *See United States v. Burrows*, 48 F.3d 1011, 1012 (7th Cir. 1995) (apartment belonging to the mother of one of two suspects, where police thought the two suspects were staying, officers observed a curtain moving in an upstairs window police had reason to believe that suspect was inside the apartment to execute arrest warrants).

The SWAT team's entry into Trzeciak's home was lawful because they had a felony arrest warrant for Trzeciak, reason to believe that 4436 Hohman was his home and that he was inside it at the time they entered to execute the arrest.  Therefore, Trzeciak's motion to suppress on those grounds is denied.

**B.      Seizure of the Gun Upon Reentry into the Home**

The defendant argues, and the government concedes, that the state search warrant obtained by Det. Mosier was invalid as lacking in probable cause because the informant's tip was not reliable under the totality of the circumstances test set out in *Illinois v. Gates*, 462 U.S. 213 (1983).  To nonetheless justify the seizure of the weapon the government argues that Special Agent Mitten and Det. Mosier were operating in good faith on a facially valid warrant.  In

10

addition, the government argues that suppression of the handgun is improper under the inevitable discovery doctrine.[5]

### 1.        The Good-Faith Exception to the Exclusionary Rule

The government argued in passing in its brief (*see* pages 8 and 10 of Government's Memorandum) that the officers were acting in good faith.  *United States v. Leon*, 468 U.S. 897 (1984).  At the suppression hearing, the government fleshed this argument out, and at the conclusion of the hearing, the Court invited further briefing from the parties on issues raised at the hearing.  We conclude that although the search warrant was not supported by sufficient probable cause, the warrant was not so facially invalid to result in suppression of the handgun.

When evidence is obtained in violation of the Fourth Amendment, the exclusionary rule precludes the use of such evidence and its fruits in criminal proceedings against the victim of the violation.  *See United States v. Calandra*, 414 U.S. 338 (1974).  However, the exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect." *Id.* at 348. The exclusionary rule has a deterrent effect when, by "punishing the behavior [which violates a citizen's Fourth Amendment rights] and removing the incentive for its repetition," *United States v. Espinoza*, 256 F.3d 718, 724 (7th Cir. 2001), *cert*.

---

[5] The government has not argued that the gun on the floor was in plain view and could have been seized on the spot by the SWAT team and that reentry into the house by the searching team to retrieve the weapon was merely a continuation of first entry.  Whether reentry into the house to seize the weapon would have been justified under *Michigan v. Tyler*, 436 U.S. 499 (1978), is not before the Court.  In *Tyler*, firemen were inside a home to extinguish a fire and observed incriminating evidence. However, because visibility was severely hindered by darkness, steam and smoke, they departed at 4 a.m. and waited (much like this case) for the smoke to clear. At daybreak, once the smoke had cleared, they reentered the residence to seize the incriminating items. The Supreme Court held that the subsequent reentry after daylight to continue investigation was "no more than an actual continuation of the first" entry, *id.* at 511, and the lack of a warrant did not invalidate the resulting seizure of evidence. The government has not relied on *Tyler* and we express no opinion on its applicability under the present facts.

*denied*, 534 U.S. 1105 (2002), it "alter[s] the behavior of individual law-enforcement officers or the policies of their departments." *Leon*, 468 U.S. at 918.  The exclusionary rule should not be applied, therefore, when its application will not result in "appreciable deterrence."  *See id.* at 909 (quoting *United States v. Janis*, 428 U.S. 433 (1976)).

Evidence obtained pursuant to a facially valid search warrant later found to be unsupported by probable cause should be suppressed only if "the magistrate abandoned his detached and neutral role, ... the officers were dishonest or reckless in preparing their affidavit, or could not have harbored an objectively reasonable belief in the existence of probable cause." *Id.* at 926.  Conversely, evidence should not be suppressed if an officer acted with objective good faith, obtained the search warrant from a neutral and detached magistrate, and acted within its scope, since the exclusion of evidence could have no affect on police conduct.  *Id.* at 919-21. In fact, an officer's decision to obtain a warrant is *prima facie* evidence that he was acting in good faith.  *United States v. Mykytiuk*, 402 F.3d 773, 777 (7th Cir. 2005) (citing *United States v. Merritt*, 361 F.3d 1005, 1013 (7th Cir. 2004)).  Since the government concedes that the warrant at issue was flawed, and the Court agrees, the question is whether the good-faith exception to the exclusionary rule applies here.

Police officers are charged with having knowledge of well-established legal principles. *United States v. Koerth*, 312 F.3d 862, 869 (7th Cir. 2002).  But, the Seventh Circuit has taken a narrow view in determining whether a legal principle is well-established, holding that evidence seized pursuant to a search warrant should not be excluded unless the supporting affidavit is "plainly deficient" or where "courts have clearly held that a materially similar affidavit

previously failed to establish probable cause under facts that were indistinguishable from those presented in the case at hand." *Id.* at 869.

The Court is convinced that Agent Mitten and Det. Mosier acted in objective good faith when they relied on the state search warrant and retrieved the gun from inside Trzeciak's house. While the affidavit does fall short of providing the necessary details to establish probable cause, it is not plainly deficient on its face.

Here, the anonymous informant provided firsthand observations and specific details regarding the number and the types of weapons the defendant had inside his home, the type of drugs sold out of the home and the location within the home where the defendant stored the drugs. *See United States v. Olson*, 408 F.3d 366, 370 (7th Cir. 2005) (citing *United States v. Johnson*, 289 F.3d 1034, 1038 (7th Cir. 2002)) (when assessing the credibility of a confidential informant, the court asks whether the informant: (1) had firsthand knowledge; (2) provided sufficient details; (3) relayed information which was subsequently corroborated; and (4) testified at a probable cause hearing).

In addition to the details concerning the location of the drugs and weapons, the anonymous informant provided an account of being present in the house with Trzeciak when a Hammond police officer knocked on the door to arrest him. The informant told the officer that Trzeciak was not home when in fact he was standing behind the door holding a weapon at the time. (*See* Defendant's Ex. A at ¶ 2 of Affidavit.) This event was corroborated by the Hammond Police Officer who recounted the incident to Detective Bagdon of the Chicago Police Department as detailed in paragraph one on page four of the affidavit in support of the warrant.

The informant also provided a detailed physical description of the outside of the home that was later corroborated by police. *See United States v. Lloyd*, 71 F.3d 1256, 1263 (7th Cir. 1995) (finding probable cause for issuance of warrant where CI gave detailed description of building, the location of the apartment and the weapons within the building, and police verified that the CI's description of the buildings was correct, the CI picked defendant out of photo array, and where police ran defendant's record). The informant also told the police that Trzeciak resided at the house and this also checked out. (*See* Defendant's Ex. A at ¶ 3 of Affidavit.)

Finally, the affidavit indicates that the police ran a criminal history check on Trzeciak that revealed that he had a prior arrest in Hammond for dealing in a controlled substance approximately a year earlier and that he had also been arrested in Illinois for weapons offenses and possession of cocaine. While a record check alone cannot serve to corroborate an informant's account, *see United States v. Peck*, 317 F.3d 754, 757 (7th Cir. 2003), a judicial officer may take into account prior similar arrests when making a probable cause determination for a warrant. *See, e.g.*, *Greenstreet v. County of San Bernardino*, 41 F.3d 1306, 1309 (9th Cir. 1994); *United States v. Jakobetz*, 955 F.2d 786, 803-04 (2d Cir. 1992) (citing *United States v. Harris*, 403 U.S. 573, 582 (1971)). Taking all of this into consideration, the Court finds that it was reasonable for Agent Mitten and Detective Mosier to rely on the warrant issued by a neutral and detached officer of the court. *Leon*, 468 U.S. at 923.

Evidence of the officers' good faith behavior is bolstered in this case by the fact that the officers took the extra step of consulting with an AUSA before executing the warrant and reentering the residence. Courts look with favor upon law enforcement officers who consult with prosecutors in obtaining opinions on search issues. *See e.g., United States v. Brown*, 328 F.3d

14

352 (7th Cir. 2003); *Merritt*, 361 F.3d at 1012-13; *Mykytiuk*, 403 F.3d at 778.   Agent Mitten and

Det. Mosier took active steps to ensure that their reliance on the state warrant was proper.  Agent

Mitten contacted the AUSA on duty to see if they needed a federal search warrant to reenter the

house.  During this call Agent Mitten allowed the AUSA to speak directly on the phone with

Det. Mosier who supplied the affidavit to the Hammond City Judge.  After their discussion

concerning the search warrant, Agent Mitten was informed by the AUSA that it was not

necessary for him to obtain a federal search warrant.  The fact that the officer's took the extra

step to consult with the AUSA is further proof of their good faith.[6]

Trzeciak also argues that the warrant is faulty because "[t]here is no designation of an

address on the face of the warrant nor any specific items to be seized . . ."  (Defendant's Mem. at

2.)  This simply is not the case because the warrant specifically incorporates by reference

"Exhibit A" which is denoted "Affidavit for Search Warrant."  Exhibit A to the warrant lists the

property to be searched as the residence at 4436 Hohman Ave, Hammond, Indiana.  It also lists

the items to be seized, and then the following four pages contain the affidavit purporting to

establish probable cause.  It is permissible for a warrant to incorporate by reference the place to

be searched and the items to be seized.  *See e.g. United States v. Jones*, 54 F.3d 1285, 1290 (7th

Cir. 1999).

---

[6] None of this is to excuse the performance of the AUSA. It clearly would have been better practice for the AUSA to actually review the state search warrant rather than rely upon Mosier's description of the warrant.  Such a review would have revealed the deficiencies in the warrant that the government now concedes exist.  *See United States v. Merritt*, 2002 WL 243429, at *11 (S.D. Ind. Jan. 9, 2002) (observing that if a government attorney were subject to the exclusionary rule rather than encouraging attorneys to perform more competently, it would discourage police from going to attorneys for assistance).  Inasmuch as the officers saw Trzeciak pointing a firearm at them on two occasions and knew that he was a convicted felon, obtaining a federal (or another state) search warrant would have been a routine matter.

Finally, Trzeciak contends that the list of items contained on Exhibit A is overbroad based on the facts contained in the supporting affidavit, thereby making the warrant invalid. Where a warrant is facially sufficient as to some, but not all, of the items which it states may be seized, the warrant is not invalid in total, but only as to the particular items for which seizure was not sufficiently justified. *United States v. Dorfman*, 542 F. Supp. 345, 378 n.30 (N.D. Ill. 1982), *app. dismd.*, 690 F.2d 1217 (7th Cir. 1982). Here, the list of items to be seized is overbroad. For example, there is not sufficient justification in the affidavit for the inclusion of "gang paraphernalia" on the items to be seized list. But, the facts contained in the affidavit clearly justify the inclusion of "firearms" on the list. Therefore, the warrant is facially valid as it pertains to the handgun.

In *Leon*, the Supreme Court concluded that "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Leon*, 468 U.S. at 918. Thus, in order to safeguard important Fourth Amendment rights, application of the exclusionary rule involves balancing the benefit derived by deterring law enforcement officers from violating constitutional rights against the cost to society of excluding otherwise probative evidence of a crime. In this case, it is clear to the Court that there is little deterrence benefit to be gained in this case where the officers actually obtained a search warrant (albeit a faulty one), and then intent on doing things the right way, actually called the U.S. Attorney's Office to verify the validity of the warrant and to check if they should get a new warrant. This is precisely the type of behavior that should be encouraged. For these reasons, the defendant's motion to suppress the handgun seized inside his home is denied.

16

## 2.      Inevitable Discovery Doctrine

The government contends that regardless of the applicability of the *Leon* good faith

exception, the gun should be admissible under the doctrine of inevitable discovery.  In *Nix v.*

*Williams*, 467 U.S. 431 (1984), the Supreme Court held that under the inevitable discovery

doctrine illegally obtained evidence need not be suppressed "[i]f the prosecution can establish by

a preponderance of the evidence that the information ultimately or inevitably would have been

discovered by lawful means." *Id.*  at 444.  This is because in such situations "the deterrence

rationale (of the exclusionary rule) has so little basis that the evidence should be received." *Id*;

*see e.g.*, *United States v. Brown*, 328 F.3d 352, 357 (7th Cir. 2003).  To prove inevitability, the

government must establish that it had probable cause and demonstrate the existence of a "chain

of events that would have led to a warrant . . . independent of the search." *Brown*, 328 F.3d at

357, (quoting *United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir. 1995)).  In other words, the

government must prove by a preponderance of the evidence that it would have obtained the

challenged evidence through lawful means.  *United States v. Gravens*, 129 F.3d 974, 979-80 (7th

Cir. 1997).

Here, based on what the officers observed on the day of Trzeciak's arrest, they plainly

had probable cause to believe that evidence of a crime was located inside Trzeciak's home, and

none of this probable cause was obtained illegally.  First, they knew that Trzeciak was a

convicted felon and at least two officers, Porter and Bogie, saw Trzeciak with the gun in his

hands as he pointed it at them just prior to his arrest.  When Officer Porter observed this he was

lawfully in Trzeciak's driveway and Lt. Bogie was lawfully inside Trzeciak's home executing a

felony arrest warrant against him.  *See supra* at 8-10.  After Trzeciak dropped the gun, members

of the Hammond SWAT team arrested Trzeciak in the basement of his home and saw the gun lying on the floor just below him.  Clearly, this was probable cause that evidence (the handgun) of the crime of felon in possession of a firearm was located inside the house.

In addition, the government presented evidence of a "chain of events that would have led to a warrant."  *Brown*, 64 F.3d at 1085.  This is demonstrably true because Agent Mitten in fact called an AUSA to start the process of getting a warrant.  This phone call would have led to the issuance of a search warrant.  The process was only halted because the AUSA gave the agents erroneous advice that they did not need a new warrant because the original state warrant would suffice.  *See United States v. Lamas*, 930 F.2d 1099, 1103 (5th Cir. 1991) (explaining that "[i]t is not uncommon for officers to contend that if not for some intervening event – such as a confession or a consent to search – they would have gotten a valid search warrant and would have discovered the evidence legally in the absence of the illegal search").

The defendant argues that the government's failure to obtain a warrant is fatal.  But that is not necessarily so.  Several cases have relied on the inevitable discovery doctrine in situations like the present one where the officers started to get a warrant but for various reasons did not actually obtain one.  As long as there is evidence that the government took some steps towards getting a warrant, then the inevitable discovery doctrine may apply.  *See e.g.*, *United States v. Souza*, 223 F.3d 1197, 1203-05 (10th Cir. 2000) (applying inevitable discovery doctrine where UPS employee illegally opened a package at the behest of DEA agent but another agent started to obtain a warrant); *United States v. Ford*, 22 F.3d 374, 378 (1st Cir. 1994) (finding that decision to seek a warrant was made prior to warrantless entry where postal inspector asked defendant for consent to search his house and informed the defendant that the search would take

18

place in any case after the office obtained a warrant); *Llamas*, 930 F.2d 1099 (5th Cir. 1991) (finding there are no prerequisites like the drafting of the affidavit or calling the magistrate for the inevitable discovery exception to apply); *United States v. Elder*, 352 F. Supp. 2d 880, 887-88 (C.D. Ill. 2005) (applying inevitable discovery doctrine where but for invalid consent to search police would have obtained a search warrant based on probable cause); *United States v. Rucker*, 348 F. Supp. 2d 981, 1004-05 (S.D. Ind. 2004) (applying inevitable discovery doctrine where at the time of search agents had been working in excess of nine hours to prepare probable cause affidavit, and would have obtained warrant absent invalid consent to search). *Cf. United States v. Allen*, 159 F.3d 832, 841-42 (4th Cir. 1998) (refusing to apply the inevitable discovery doctrine when evidence could not have been discovered without a subsequent search, where no exception to the warrant requirement applies, where no warrant has been obtained, and where nothing demonstrates that the police would have obtained a warrant absent the illegal search).[7]

For example, in *Lamas,* as in this case, the officers secured the house of a suspected drug dealer to prevent destruction or removal of evidence from inside the house.  One officer left to obtain a search warrant but before he left the premises, he was informed that the defendant consented, involuntarily as it turned out, to the search of the house.  The officer then abandoned his plans to obtain a search warrant.  The Fifth Circuit found that the existence of probable cause to search the house, the officers' securing of the house and one of the officers leaving to obtain a warrant before the invalid consent was obtained was sufficient to support the application of the inevitable discovery exception.  *Lamas*, 930 F.2d at 1103.

---

[7] The government also relies on *United States v. Buchanan*, 910 F.2d 1571 (7th Cir. 1990), but that case was substantially limited by *Brown*, 64 F.3d at 1085-86.

The same is true here.  The officers clearly had probable cause that a handgun was inside the home which was evidence of the crime of felon in possession of a firearm. The officers then secured the residence while Agent Mitten and Det. Mosier called the prosecutor to inquire about getting a warrant.  Had the officers known that the original warrant was defective, they would have obtained a new warrant based on the fresh probable cause.  But like the officers in *Lamas* who assumed the consent was valid, the officers in this case – based on the advice of counsel – believed that the first warrant was valid.

While we are mindful that "the inevitable discovery doctrine is not to be invoked casually," *Gravens,* 129 F.3d at 980, we are persuaded that this is a case where "the deterrence rationale for applying the exclusionary rule has so little basis that the evidence should be received."  *United States v. Cotnam*, 88 F.3d 487, 496 (7th Cir. 1996) (citing *Nix*, 467 U.S. at 444)).  This is not a case where the officers could have gotten a warrant but chose not to.  Rather, it is more accurate to say that they called the prosecutor to get a warrant but were rebuffed – not because they lacked probable cause but because the prosecutor told them a second warrant was unnecessary.  Because there would be little deterrence value to be gained by suppressing the handgun in this case, the motion to suppress is denied.

**CONCLUSION**

For the foregoing reasons, defendant Joseph Trzeciak's Motion to Suppress [Doc. 34] is hereby **DENIED**.  All dates in this matter are hereby **REAFFIRMED**.

**SO ORDERED.**

ENTERED: July 28, 2005

s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT